1  John Burton, State Bar No. 86029
   jb@johnburtonlaw.com
2  THE LAW OFFICES OF JOHN BURTON
   128 North Fair Oaks Avenue
3  Pasadena, California  91103
   Telephone:  (626) 449-8300

4  Julia Yoo, State Bar No. 231163
   IREDALE AND YOO, APC
5  105 West F Street, Fourth Floor
   San Diego, California  92101
6  Telephone:  (619) 233-1525

7
   Attorneys for Plaintiff Patricia Narciso, Individually and
8  Through her Conservators Marcelina Luna and Tracy Narciso

9
                    UNITED STATES DISTRICT COURT
10                  SOUTHERN DISTRICT OF CALIFORNIA
11

| | |
|---|---|
| PATRICIA NARCISO, Individually and Through her Conservators MARCELINA LUNA and TRACY NARCISO,<br><br>    Plaintiff,<br><br>v.<br><br>COUNTY OF SAN DIEGO, SHERIFF WILLIAM GORE, DEPUTIES DONALD FRANK and DARSHAUN DOUGLAS, and Does 1 to 10,<br><br>    Defendants. | Case No. **'20CV0116 JLS  MSB**<br><br>**COMPLAINT FOR DAMAGES:**<br><br>**1.   42 U.S.C. § 1983 Individual Liability**<br><br>**2.   42 U.S.C. § 1983 Entity and Supervisory Liability**<br><br>**3.   American With Disabilities Act**<br><br>**4.   Rehabilitation Act of 1973**<br><br>**5.   Cal. Civ. Code §§ 51.7 and 52.1**<br><br>**6.   Battery**<br><br>**DEMAND FOR JURY TRIAL** |

# I.
# JURISDICTION AND VENUE

1. Plaintiff alleges claims under 42 U.S.C. § 1983, the American's with Disabilities Act and the Rehabilitation Act. Accordingly, 28 U.S.C. § 1331 (federal question) and § 1343 (civil rights) provide subject matter jurisdiction. Plaintiff's state-law claims form part of the same case and controversy, and are within the supplemental jurisdiction of the Court pursuant to 28 U.S.C. § 1367.

2. Plaintiff's claims arise out of a course of conduct involving officials of the County of San Diego that took place in the County of San Diego, State of California, and within this judicial district.

# II.
# PARTIES

3. Plaintiff Patricia Narciso is a mentally disabled adult. She files this case individually and through her two conservators, her mother, Marcelina Luna, and her sister, Tracy Narciso, San Diego Super. Ct. No. 37-2017-00021981-PR-LP-CTL. The letters were issued April 16, 2018, about seven months before this incident.

4. Defendant County of San Diego is a government entity operating pursuant to its Charter.

5. Defendant William Gore was, at all relevant times, the Sheriff of the County of San Diego, the highest position in the San Diego County Sheriff's Department. ("SDCSD") As Sheriff, Defendant Gore was responsible for the hiring, screening, training, retention, supervision, discipline, counseling, and control of all San Diego County Sheriff's Department employees and/or agents, and Doe Defendants.

6. At all times relevant to this complaint, Defendant William Gore was a policy-maker for the San Diego Sheriff's Department and responsible for promulgation of the policies and procedures and allowance of the practices/customs pursuant to which the acts of the Sheriff's Department alleged

herein were committed, as well as the supervision and control of officers who are or were employed by the Sheriff's, who are under his command and/or who report to him, including the Defendants to be named.

7. Defendant Gore is sued in his individual capacity for his own personal action or inaction.

8. Defendants Donald Frank (#3600) and Darshaun Douglas (#4911) are SDCSD deputy sheriffs. In doing the acts alleged below each acted within the scope of that employment as an agent and employee of Defendants County and SDCSD, and under color of state law.

9. Plaintiff sues defendants Does 1 to 10 by their fictitious names and will amend this complaint to allege their true identities when ascertained.

## III.
## EXHAUSTION OF ADMINISTRATIVE REMEDIES

10. The County granted Plaintiff leave to file her Cal. Gov't Code § 910 claim approximately three weeks after the deadline. Plaintiff filed the appropriate administrative claim, which was denied on July 17, 2019. This lawsuit is timely.

## IV.
## FACTS

11. On November 27, 2018, Plaintiff Patricia Narciso was a 21-year-old woman with a complex of disabling mental conditions including autism, anxiety disorder, and oppositional defiant disorder. Medical doctors prescribed Haldol, Risperdal, Depakote and Cogent to stabilize her mood. Patricia had been hospitalized in a psychiatric setting many times. In addition, she previously resided in a residential treatment center for two years. Although she was then living at home with her mother, Patricia requires adult supervision at all times to ensure her safety and well being. Her mother and sister, as her conservators, protected Patricia and managed her affairs.

12. That morning, Patricia was at the Fred Finch Youth Day Center, a school for children and adults with special needs located at 3845 Spring Drive in Spring Valley, California. Facility staff called 911 for assistance with Patricia, who had an episode of irrational, agitated behavior caused by her pre-existing conditions.

13. Defendants Douglas and Frank responded, arriving around 11:00 a.m. By the time the deputies arrived, staff had Patricia in a "safety room," where she had somewhat calmed down. The deputies were informed and knew that Patricia suffered from autism, which results in severe emotional and behavioral problems. The deputies knew from the outset that the incident involved control of a disabled person who was a patient, rather than a crime involving a criminal.

14. Deputy Douglas handcuffed Patricia behind her back, which were not appropriate restraints under the circumstances, and sat her up. Deputy Douglas then escorted some of the staff members out of the safety room to speak to them about what had occurred.

15. Deputy Frank remained in the safety room with Patricia and at least one staff member. Patricia began acting out again. She wound up in some sort of altercation with Deputy Frank, although she remained handcuffed throughout and therefore posed no actual threat. Deputy Frank alleges Patricia tried to remove his firearm from his holster, which would not have been feasible given that she was handcuffed behind her back.

16. By the time Deputy Douglas re-entered the safety room, Deputy Frank had Patricia pinned to the floor. Deputy Douglas placed Patricia on a 72-hour hold pursuant to Cal. Welf. & Inst. Code § 5150.

17. No effort was made to contact medical professionals through the school. Moreover, instead of calling an ambulance so that Patricia could be transported safely on a gurney in soft restraints to a psychiatric facility for her mental evaluation by persons trained in handling psychotic patients, the two deputy

defendants began walking her to their car handcuffed behind her back, as if she were a common criminal capable of rational behavior.

18.   When Patricia gestured as if trying to kick a staff member, each deputy put her in a "hammerlock" by placing his arm between her handcuffed arm and her back, and bending her forward until her upper body was parallel to the ground.

19.   The pain was excruciating, causing Patricia to scream as she was being forced to the car. She complained she could not breathe.

20.   After letting Patricia stand upright briefly, the deputies forced her forward and slammed her into the asphalt, face first, landing on her back and shoulders. Patricia, who was in handcuffs, presented no immediate threat to the deputies when they slammed her to the ground. The force caused commuted fractures to both the left humerus and the right humerus.

21.   Defendant Schick (#2295), an SDCSD sergeant, and SDCSD deputies Hvizdzak (#1023), Abril (#7044) and Collins (#0171) responded after Douglas and Frank broke Patricia's arms to document the incident. An ambulance took Patricia to Scripps Mercy Hospital for emergency medical treatment, where she was admitted and remained for 12 days for medical, not psychiatric, treatment.

22.   The fractures to her arms were so severe that she had two surgeries. Both upper arms required open reductions and the installation of hardware.

# V.
# MONELL AND SUPERVISORY LIABILITY ALLEGATIONS

23.   There has been a systemic failure in San Diego County to investigate incidences of deaths and serious injuries caused by Sheriff's deputies' use of force; to discipline deputies who used unwarranted force; and to supervise and train deputies to ensure that excessive force is not used.

24.   At the time of this incident, Defendants County of San Diego, Gore, and Doe Defendants were aware of the long-standing custom and practice of

- 5 -

inadequate investigations and failures to train and discipline deputies for the use of excessive force. These Defendants were aware of the following cases where deputies were alleged to have used excessive force, but took no action:

    i.    In *Silva v. County of San Diego*, 18-cv-02282-L-MSB, Sheriff's deputies shot a schizophrenic man with water balls and Tased him between four to nine times while six other members of the Tactical Team held him down with a body shield and pressed down on his torso. At least six members were on or around his body with a shield placed on top of his torso, with two officers pushing down on the shield. These deputies heard Paul yell "no, don't do it, sir" but continued to put their body weight on Paul until he was taken to UCSD Hospital unconscious. Paul, who had not committed a crime, died from the trauma.

    ii.    In *DeLeon v. County of San Diego*, the plaintiff claimed that in 2018, deputy Klein repeatedly punched and kicked his head, face, neck and spine while the plaintiff was on the ground. Deputy Klein was hired by the County after the County of Riverside rejected him as an applicant after failing a polygraph on a question as to whether Klein had ever been associated with a white supremacist organization.

    iii.    In 2018, the County settled a case with a young black man who alleged that Deputy Ward put the plaintiff in a chokehold without any basis. Ward was never disciplined as a result of the incident.

    iv.    In 2018, deputies Nicholas Morgan and Joshua Nahan were criminally prosecuted after a video of them beating defenseless people went viral.

    v.    In *Hayes v. County of San Diego*, 736 F.3d 1223 (9th Cir. 2013), deputies were summoned for a welfare check and used excessive force on a man.

    vi.    In *Kendrick v. County of San Diego*, 2018 WL 1316618, case no. 15-cv-2615-GPC (AGS), deputies shot and killed a suicidal man.

    vii.   In *Maxwell v. County of San Diego*, 708 F.3d 1075 (2013), a Sheriff's deputy shot his wife in the jaw with his service pistol and responding deputies prevented the ambulance holding the wife from leaving, which delayed her medical care and led to her death.

    viii.   In *S.B. v. County of San Diego*, 864 F.3d 1010, 1014 (2017), the Ninth Circuit held a jury could conclude that deputies' used unreasonable force when they shot and killed a mentally ill man.

    ix.   In *Mendoza v. County of San Diego*, No. 17CV1349 W (NLS), 2018 WL 1185230, at *1 (S.D. Cal. Mar. 7, 2018), a deputy drove his patrol car into plaintiff, throwing plaintiff in the air.

    x.   In *Estate of Tommy Tucker v. County of San Diego*, 11-CV-0356-JLS-WVG (S.D. Cal. 2011), decedent Tommy Tucker was a mentally ill inmate in the San Diego Central Jail who was given conflicting commands by deputies during lockdown.  After Tommy complied with one deputy's command, three deputies sprayed Tommy with OC spray; one applied a carotid hold on Tommy from behind; five deputies rushed at Tommy, "swarming" him; and then all deputies piled on top of him to apply mechanical restraints.  One deputy applied a "spit sock" over Tommy's head, which was wet from the OC spray, as he lay face down in a prone position.  Tommy Tucker suffered anoxic encephalopathy (brain death) due to prolonged hypoxia and cardiac arrest.

    xi.   In *A.B. v. County of San Diego*, case no. 18-CV-01541-MMA-LL (S.D. Cal. 2018), on October 14, 2017, Sheriff's deputies approached Kristopher Birtcher, a mentally impaired man.  Deputies repeatedly Tased Mr. Birtcher; struck and beat him; forced him to lay prone on the ground, face down, in restraints as multiples deputies pressed down on him; used a spit sock to cover his face; and ultimately killed Mr. Birtcher.

xii. In *Washington v. County of San Diego*, 02-CV-0143-LAB-JMA (S.D. Cal. 2002), Marshawn Washington, an inmate by George Bailey, was killed by deputies. Mr. Washington had complained regarding a deputy's conduct. Deputies placed a spit sock over Mr. Washington's head; attempted to force him in a "Pro-straint Chair"; one deputy applied a carotid restraint hold to Mr. Washington's neck; and then deputies placed Mr. Washington face down on the ground and hog-tied him. Mr. Washington was forced on his belly with his wrists and ankles cuffed together behind his back. He said he could not breathe. Witnesses heard him choke and gag. Mr. Washington eventually suffocated to death.

xiii. In *Marcial Torres v. County of San Diego*, case no. 15-CV-01151-CAB-BLM (S.D. Cal. 2015), a Sheriff's deputy repeatedly tased Marcial Torres who was unarmed. After repeated Tases, Marcial Torres lay face down on the ground in handcuffs. He stopped breathing and turned blue in the face. No deputy attempted to render any aid to Mr. Torres. Based on the records and testimony of Vista Fire Department paramedics, Mr. Torres had been without a pulse anywhere from 12 to 20 minutes. Because of the length of time Mr. Torres had gone without a pulse, his body had shut down. Oxygen had stopped circulating to his brain, causing an anoxic brain injury. While comatose in the hospital, doctors amputated Mr. Torres' legs and fingers due to sepsis. While Mr. Torres regained consciousness, the anoxic brain injury affected his cognitive function. The County settled with plaintiff for $3,000,000.

xiv. *Jimenez v. County of San Diego*, case no. 15-cv-02299-L-JLB ($500,000 settlement for excessive force when a deputy beat a man with a flashlight while he was handcuffed).

xv. *Pitt v. County of San Diego*, Case No. 3:16-cv-00515, 2017 ($220,000 settlement for false arrest).

xvi. *Bush v. County of San Diego*, Case No. 15-cv-00686-L-JMA (S.D. Cal. 2016) ($225,000 settlement for police shooting of family dog after plaintiffs established liability by winning a motion for summary judgment).

xvii. *Johnson v. County of San Diego*, Case No. 14-cv-616-LAB (S.D. Cal. Feb. 1, 2016) (unanimous jury verdict of excessive force and false arrest, awarding total damages of $600,000)

xviii. *Antonio Martinez v. County of San Diego*, 37-2014-00013656-CU-CR-NC, in 2012, a $1 million settlement in an excessive force case involving a San Diego County Sheriff's deputy and man with Down Syndrome, who was wrongfully beaten and detained.

25. Despite their awareness of the deficiency of their policies, Defendants County of San Diego, Gore, and Doe Defendants continued to maintain the following unconstitutional customs, practices, and policies:

i. Using excessive force on unarmed person who do not pose a risk of imminent death or serious bodily injury to others;

ii. Providing inadequate training regarding the use of force;

iii. Providing inadequate training regarding the use of force against mentally ill or disabled individuals;

iv. Maintaining grossly inadequate procedures for reporting, supervising, investigating, reviewing, disciplining and controlling misconduct by County Sheriff's deputies, including the misconduct of the Defendant-deputies in this case;

v. Announcing that unjustified uses of force are "within policy" that were later determined in court to be unconstitutional;

vi. Even where the conduct of the deputies is determined in court to be unconstitutional, refusing to discipline, terminate, or retrain the deputies involved;

    vii.    Refusing to discipline deputies for unlawful conduct even when an independent body, Citizen Law Enforcement Review Board (CLERB) issues a finding of misconduct or violation of law;

    viii.    Maintaining a policy in which deputies are allowed to 1) speak to each other; 2) view video tapes of the incident; and/or 3) speak to a lawyer before writing incident reports of use of force;

    ix.    Maintaining a policy of inaction and an attitude of indifference evidenced by failing to discipline, retrain, investigate, terminate, and recommend deputies for criminal prosecution who participate in the use of force against unarmed, nonviolent, compliant, and/or potentially mentally impaired people.

26. The failure to adequately train, supervise and discipline deputies in the face of such widespread practice of using excessive force amounts to deliberate indifference to the rights of persons with whom they come into contact. Such failure to train was as a result of an official or de facto policy or custom of the County, which caused the constitutional deprivation in this case.

27. Defendants County and Gore knew that interacting with individuals with mental or developmental disabilities is a recurring event. Despite this knowledge, Defendants failed to properly train their deputies in appropriate ways to approach and communicate with them in a way that their commands may be understood; identify and differentiate symptoms of disabilities from criminal conduct; or to handle and transport them in a safe manner that would not cause injuries. Defendants failed to train their deputies to properly handle a "5150" mental health call, which requires a welfare check.

## V.
## DAMAGES

28. As a direct and proximate result of the aforesaid acts, omissions, customs, practices, policies and decisions of Defendants, Plaintiff was injured in

her health and person. She suffered and will continue to suffer great mental and physical suffering, anguish, fright, nervousness, anxiety, shock, humiliation, indignity, embarrassment, harm to reputation, and apprehension, which have caused Plaintiff to sustain damages in a sum to be determined at trial.

29. As a further direct and proximate result of the aforesaid acts, omissions, customs, practices, policies and decisions of Defendants, Plaintiff incurred medical and other expenses, and will incur future medical and other expenses, which have caused Plaintiff to sustain damages in a sum to be determined at trial.

30. As a further direct and proximate result of the acts, omissions, customs, practices, policies and decisions of Defendants, Plaintiff incurred various expenses and other special damages, which have caused Plaintiff to sustain damages in a sum to be determined at trial.

31. The acts, omissions and decisions of individually named and Doe Defendants, excluding Defendant County, was willful, wanton, malicious and oppressive, with reckless disregard for, and with the intent to deprive Plaintiff and others similarly situated of their constitutional rights and privileges, and did in fact violate the aforementioned rights and privileges, entitling Plaintiff to exemplary and punitive damages in an amount to be determined at trial.

## VI.
## FIRST CLAIM FOR RELIEF
## DEPRIVATION OF CIVIL RIGHTS – 42 U.S.C. § 1983
## FOURTH AMENDMENT – EXCESSIVE FORCE
(Against Defendants Douglas, Frank and Does)

32. Plaintiff realleges all prior paragraphs of this complaint and incorporates the same herein by this reference.

33. Defendants, while acting under color of law, deprived Plaintiff of her civil rights by violating rights guaranteed by the Fourth Amendment of the United

States Constitution, including but not limited to, the right to be free from excessive force.

34. As a direct and proximate result of the foregoing, Plaintiff sustained injury and damage as alleged above.

## VII.
## SECOND CLAIM FOR RELIEF
## DEPRIVATION OF CIVIL RIGHTS – 42 U.S.C. § 1983
## ENTITY AND SUPERVISORY LIABILITY
(Against Defendants County, Gore and Does)

35. Plaintiff realleges all prior paragraphs of this complaint and incorporates the same herein by this reference.

36. At all times herein mentioned, Defendants County, Sheriff Gore, and Does, with deliberate indifference, and conscious and reckless disregard to the safety, security and constitutional and statutory rights of Plaintiff and others similarly situated, including the right to be free from excessive force, maintained, enforced, tolerated, ratified, permitted, acquiesced to, promulgated, and applied, among others, the following policies, practices and customs:

   a. Failing to adequately train, supervise, and control deputies in uses of force, particularly in regards to handling people such as Plaintiff who are disabled as the result of mental illness and who suffer from extreme behavioral issues over which they have no control;
   b. Failing to set up systems to prevent abuse by deputies including the failure to properly investigate timely and, when appropriate, discipline uses of force;
   c. Failing to terminate or otherwise discipline deputies who abuse their authority;
   d. Failing to arrest deputies who commit crimes while on patrol and referring them for prosecution;

  e. Condoning and encouraging deputies in the belief that they can violate the rights of persons such as Plaintiff with impunity, on video recordings, knowing that their criminal, thuggish conduct will not adversely affect their opportunities for retention, promotion, and other employment benefits; and

  f. Encouraging deputies to treat mentally disabled people such as Plaintiff as criminals rather than patients.

The foregoing list is illustrative and not exhaustive.

37. Defendants' practices and customs of failing to properly hire, train, supervise, monitor, discipline, counsel, transfer, and control deputy sheriffs, the code of silence, and the encouragement of unreasonable searches and seizures and wrongful arrests are interrelated and exacerbate the effects on each other to institutionalize police lying and immunize police officers from discipline.

38. Additionally, the involvement in, and ratification of, the unconstitutional actions of the Defendants by municipal supervisors and policymakers, including Defendant Gore and Does, further establishes that these acts were part of a widespread municipal policy, practice and custom.

39. The aforementioned policies, practices and customs, separately and together, proximately caused injury to Plaintiff because Defendants Douglas and Frank knew that their misconduct, even though recorded, would go unchallenged by supervisors and fellow officers. These interrelated policies, practices and customs, as set forth above, both individually and together, were maintained and implemented with deliberate indifference, and encourage Defendants to commit the wrongful acts against Plaintiff and therefore acted as a moving force and were, separately and together, direct and proximate causes of the constitutional deprivation and injuries to Plaintiff.

40. As a direct and proximate result of the foregoing, Plaintiff sustained injury and damage as alleged above.

# VIII.
# THIRD CLAIM FOR RELIEF
## AMERICANS WITH DISABILITIES ACT — 42 U.S.C. § 12131 et seq.
(Against Defendant County)

41. Plaintiff realleges all prior paragraphs of this complaint and incorporates the same herein by this reference.

42. Congress enacted the ADA upon finding, among other things, that "society has tended to isolate and segregate individuals with disabilities" and that such forms for discrimination continue to be "serious and pervasive social problem." 42 U.S.C. § 12101(a)(2).

43. In response to these findings, Congress explicitly stated that the purpose of the ADA is to provide "a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities" and "clear, strong, consistent, enforceable standards addressing discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(l) (2).

44. Title II of the ADA provides in pertinent part: "[N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

45. At all times relevant to this action, Defendant County was a public entity within the meaning of Title II of the ADA and provided a program, service, or activity to the general public.

46. At all times relevant to this action, Plaintiff was a qualified individual with a disability within the meaning of Title II of the ADA and met the essential eligibility requirements for the receipt of the services, programs, or activities of Defendants. Plaintiff was an individual suffering from an impairment that substantially limited one or more major life activities.

47. Providing assessment and safe transportation to a hospital, community

health or jail is a service, program or activity of Defendant County.

48. ADA creates an affirmative duty in some circumstances to provide special, preferred treatment, or "reasonable accommodation." Facially neutral policies may violate the ADA when such policies unduly burden disabled persons, even when such policies are consistently enforced.

49. Through the acts and omissions of Defendants and their agents and employees described herein, Defendants have subjected Plaintiff to discrimination on the basis of disability in violation of Title II of the ADA by failing to provide her with safe transportation to a psychiatric facility for evaluation and treatment of her condition, and by retaliating against Plaintiff for engaging in behaviors that were the result of her disability and not volitional action.

50. As a direct and proximate result of the foregoing, Plaintiff sustained injury and damage as alleged above.

## IX.
## FOURTH CLAIM FOR RELIEF
## REHABILITATION ACT OF 1973 — 29 U.S.C. § 794
(Against Defendant County)

51. Plaintiff realleges all prior paragraphs of this complaint and incorporates the same herein by this reference.

52. Section 504 of the Rehabilitation Act of 1973 provides in pertinent part: "[N]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits, or be subjected to discrimination under any program or activity receiving federal financial assistance." 29 U.S.C. § 794.

53. Plaintiff was at all times relevant herein a qualified individual with disabilities within the meaning of the Rehabilitation Act because she has physical, mental and emotional impairments that substantially limits one or more of her major life activities. *See* 29 U.S.C. § 705(20)(B).

54. At all times relevant to this action Defendants were recipients of federal funding within the meaning of the Rehabilitation Act.

55. Through their acts and omissions described herein, Defendants have violated the Rehabilitation Act by excluding Plaintiff from participation in, by denying her the benefits of, and subjecting her to discrimination in the benefits and services Defendants provide to the general public.

56. As a direct and proximate result of the foregoing, Plaintiff sustained injury and damage as alleged above.

## X.
## FIFTH CLAIM FOR RELIEF
## CALIFORNIA CIVIL CODE §§ 51.7 AND 52.1
### (Against All Defendants Except Sheriff Gore)

57. Plaintiff realleges all prior paragraphs of this complaint and incorporates the same herein by this reference.

58. Defendants are subject to liability under Cal. Civ. Code §§ 51.7 and 52.1 because they violated Plaintiff's federal and state constitutional and statutory rights, and did so because of her disability and medical condition, and with violence, and with threats, intimidation or coercion. Defendants retaliated against Plaintiff because she was acting out due to her disability and medical condition, of which Defendants were fully informed. Defendants violated Plaintiff's right to be free of excessive force, and her right to bodily integrity, under U.S. Const. Amend. IV, Cal. Const. Art. I, § 13 and Cal. Civ. Code § 43.  Defendants violated each of these rights through the use of violence, threats, coercion and intimidation.

59. As a direct and proximate result of the foregoing, Plaintiff sustained injury and damage as alleged above.

////

////

////

## XI.
## SIXTH CLAIM FOR RELIEF
## BATTERY
### (Against All Defendants Except Sheriff Gore)

60. Plaintiff realleges all prior paragraphs of this complaint and incorporates the same herein by this reference.

61. Defendants assaulted and battered Plaintiff without justification or probable cause.

62. As a direct and proximate result of the foregoing, Plaintiff sustained injury and damage as alleged above.

## PRAYER

WHEREFORE, Plaintiff requests relief as follows, and according to proof, against each defendant:

1. General and compensatory damages in an amount according to proof;
2. Special damages in an amount according to proof;
3. Exemplary and punitive damages against each individual and Doe defendant, not against the County, in an amount according to proof;
4. Statutory damages under the Fifth Cause of Action;
5. Costs of suit, including attorneys' fees and a multiplier; and
6. Such other relief as may be warranted or as is just and proper.

DATED: January 16, 2020          Respectfully submitted,
                                 THE LAW OFFICES OF JOHN BURTON

                                 s/ *John Burton*
                                 John Burton
                                 Attorney for Plaintiff

- 17 -

DATED: January 16, 2020                Respectfully submitted,

                                                      IREDALE AND YOO, APC

                                                      s/ *Julia Yoo*
                                                      Eugene G. Iredale
                                                      Julia Yoo
                                                      Attorneys for Plaintiff

## JURY DEMAND

      Pursuant to the Seventh Amendment of the U.S. Constitution and Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs demand a jury trial by this action.

DATED: January 16, 2020                Respectfully submitted,

                                                      THE LAW OFFICES OF JOHN BURTON

                                                      s/ *John Burton*
                                                      John Burton
                                                      Attorney for Plaintiff